E-FILED
Friday, 11 March, 2005   02:22:44 PM
Clerk, U.S. District Court, ILCD

# United States District Court

__CENTRAL__  DISTRICT OF  __ILLINOIS__

FILED
MAR 11 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA

v.

CORDELL JAMES, TYRONE RUSH,
and DWAYNE RUSH,

**CRIMINAL COMPLAINT**

CASE NUMBER: 05- 3018-m

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __February 10, 2005 to the present__ in __Sangamon__ County, in the __Central__ District of __Illinois__ the defendants:

knowingly and intentionally conspired with each other, and with others,
to distribute at least 50 grams of cocaine base ("crack")

in violation of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Section 2.

I further state that I am a __DEA Special Agent__ and that this complaint is based on the
                                    Official Title
following facts:

See attached affidavit

Continued on the attached sheet and made a part hereof:    ■ Yes    ☐ No

s/ Christian McGuire
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 11, 2005   10:55 AM                    at    Springfield, Illinois
Date                                                City and State

Byron G. Cudmore                                    s/ Byron G. Cudmore
U.S. Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

STATE OF ILLINOIS            )
                             ) ss
COUNTY OF SANGAMON           )

## AFFIDAVIT

I, Christian McGuire, being first duly sworn, hereby depose and state:

1.     I am a Special Agent (SA) of the Drug Enforcement Administration (DEA), and have been so employed since January 1997. I am presently assigned to the Springfield, Illinois, Resident Office. I have personally conducted and/or assisted in hundreds of investigations of individuals and organizations deriving income from the unlawful distribution of controlled substances. I have had hundreds of conversations with drug traffickers concerning their methods of operation in the course of investigative interviews and covert activities. I have also participated in the execution of hundreds of search warrants relating to illegal drug trafficking. In addition, I have participated in numerous federal investigations involving the court authorized interception of wire communications which resulted in the arrest and conviction of narcotics dealers, in the course of which I have listened to thousands of covertly recorded conversations between dealers revealing their methods of operation.

2. This affidavit is submitted in support of a complaint charging CORDELL JAMES, a/k/a CORY, year of birth 1974, DWAYNE RUSH, year of birth 1973, TYRONE RUSH, year of birth 1972, with conspiracy to distribute at least 50 grams of cocaine base ("crack"), in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846; and Title 18, United States Code, Section 2.

3. I am familiar with the following facts based upon my own personal observation and upon information officially supplied to me by other law enforcement agents.

4. DEA CS #05-118640 (hereafter referred to as "CS") is cooperating with the Drug Enforcement Administration in hopes of earning the reward of a reduction in sentence on federal drug charges the CS has been told will be filed when his/her cooperation is complete. Pursuant to a cooperation agreement with the United States Attorney's Office that includes a conditional grant of limited use immunity, the CS has provided intelligence information about drug trafficking activities throughout the Springfield, Illinois, area that has, in many aspects, been corroborated by information already obtained from other sources. Additionally, the CS has provided specific information concerning the CS's sources of supply for cocaine and crack cocaine. To my knowledge the CS has

never provided any inaccurate or false information in the course of his/her cooperation. The CS is, therefore, believed to be a reliable source of information.

5. On February 10, 2005, the CS was arrested and a search warrant was executed upon the CS's residence. Seized from the CS's person at the time of arrest were baggies of apparent cocaine totaling approximately 26.95 grams and baggies of apparent cocaine base ("crack cocaine") totaling approximately 50.90 grams. Seized from the CS's residence were approximately 72 grams of apparent crack cocaine and 107.2 grams of apparent cocaine. DEA SA Dollus and SA Chris McGuire subsequently field tested a sampling of the drugs seized, using a standard chemical test kit, and received a positive indication for the presence of cocaine. All of these drugs have been submitted to the DEA North Central Laboratory for analysis, but the results of that testing have not yet been received.

6. Following the CS's arrest, the CS indicated that he/she wished to cooperate with law enforcement to the fullest extent possible. In furtherance of this cooperation the CS provided the following information.

7. The CS indicated that Cordell James is one of his/her sources for cocaine/crack cocaine. The CS stated that he/she contacts Cordell by calling telephone number (773) 317-1074, which is a number provided to the CS by James. The CS stated that he/she always meets James at a public location near

the Dan Ryan Expressway in Chicago and that James usually has another individual arrive in a separate vehicle (most often a silver Chrysler Pacifica occupied by an unknown black male) that has the cocaine and crack cocaine in it. The CS stated that the last occasion when he/she received cocaine/crack cocaine from James was on February 3, 2005 and that he/she received 4.5 ounces of cocaine and 4.5 ounces of crack cocaine. The CS indicated that this occurred in Chicago, Illinois, and that the cocaine and crack cocaine found on his/her person and in his/her residence at the time of his/her arrest was a portion of this cumulative 9 ounce quantity of cocaine and crack cocaine previously purchased from James.

8.   The CS stated that he/she first met Cordell James, known only to him as "Cory," during the summer of 2004. The CS stated that he/she then began obtaining cocaine and crack cocaine from James approximately two times per week and received approximately 9 ounces to 1.5 kilograms of cocaine/crack cocaine each time. The CS indicated that the specific amounts of the individual drugs would be approximately ½ cocaine and ½ crack cocaine with the proportions varying depending on his/her need at the time. The CS stated that he/she would pay James $6,000 for 9 ounces and $18,000.00 for a kilogram of the

cocaine/crack cocaine. The CS also indicated that James knows that the CS then distributes the cocaine/crack cocaine in Springfield, Illinois.

9. On February 7, 2005, SA Chris McGuire and SA Richard Dollus met with the CS and discussed the possibility of the CS arranging for a drug transaction with James. The CS indicated that he/she had been called by James on or about February 5, 2005, and that James had initiated conversation about the CS obtaining cocaine and crack cocaine from James. The CS stated that he/she told James that he/she had been using another source but would call James in the near future. The CS stated that he/she felt that he/she would be able to obtain 18 ounces of cocaine and 18 ounces of crack cocaine from James. At approximately 2:27 p.m., the CS placed a consensually recorded telephone call to James at (773) 317-1074 (subscriber information subpoenaed, but not yet received) to arrange for this transaction. The following is a transcription of the conversation:

> CS: Hello [Pause].
>
> JAMES: Yeah?
>
> CS: What's up, playboy?
>
> JAMES: Ok...what's going on with you man?
>
> CS: You all good?

| | |
|---|---|
| JAMES: | Yeah. |
| CS: | Hey, Jo, listen now, you know what I'm saying…you know what I was getting at first, right? |
| JAMES: | Right |
| CS: | You know what I'm saying, I need to double that, actually, I need to do more than that. That what I was telling the other day. |
| JAMES: | Right! |
| CS: | I got to deal with my man. You know what I'm saying. I need to get a whole one now. |
| JAMES: | What, you need to double down order up? |
| CS: | Actually I need 36 of them. |
| JAMES: | Oh…Oh…let me try to uh, make a call for you right quick. If I could. |
| CS: | If you could. |
| JAMES: | Uh, you up this way already? |
| CS: | No, I ain't up this way yet but, you know what I'm saying. I just want to make sure you can get me, you know what I'm saying, place an order, before I go (unintelligible). You know what I'm saying. |
| JAMES: | Right! I'm fixin' to hit you… I'm fixin' to hit you right back. |
| CS: | Alright! |

JAMES: Ok!

10. Also on February 7, 2005, at approximately 2:32 p.m., the CS received an incoming call from telephone number (773) 317-1074. This call was also recorded. The following is a transcription of the conversation:

CS: Talk to me, Playboy.

JAMES: Hey, he said he got one man but fuck that, that's already broke down. He said that if you wanted, uh, to wait till in the morning, he could, you know what I'm saying, make that happen.

CS: Right, you know, I need my fried though. You know what I'm saying, but you know my situation…you know my situation. I mean I can take half of it fried if you can't fry the whole thing for me because, you know what I'm saying, once I get back down here on location, you know what I'm saying, I ain't got no place to do it. You know what I'm saying, you know how my people to be.

JAMES: Right! So you want it half and half the same way.

CS: Right! Or if you can do the whole thing that will be more gravy.

JAMES: Right! But see I need to know for sure, you know what I'm saying that you gonna come. Cause I don't wanna warm all that up and then you don't come there. Then it be fucked up for me, see what I'm saying.

CS: Right! Right!

JAMES: I'd be stuck in uh, uh mother fuckin bind. Cause every body don't like it fried.

CS: I know! But, check this out. Say I do get this in, man, next week can I get two of them?

JAMES: I mean, we'll work on shit, you know what I'm saying?

CS: Right! But that's why I (unintelligible with both parties talking at once) I talked to you first about that, you know what I'm saying.

JAMES: Right!

CS: Things, uh, things getting a little bit better for me, you know what I'm saying?

JAMES: Right.

CS: You know what I'm saying? You know, I don't want to put you on...

JAMES: Yeah, but that's all good right there, what you talking like. Really shit comes down it'll be ready.

CS: Right! That's why I was looking for that, you know what I'm saying, that better tab on that, you know what I'm saying. What we was talking about before, you know what I'm saying, you was telling me I got to go that route to get the tab.

JAMES: Right! I mean. I know for sure [inaudible] cause at least I know cause I'm going to get it knocked out for you, shit.

CS: Right! Right! That's, that's...Ok! Ok! You know what I'm saying.

JAMES: You know what I'm saying!

CS: Right! You know what I'm saying.

JAMES: [inaudible] a week

| | |
|---|---|
| CS: | OK! OK! You know what I'm saying. What are we working with? |
| JAMES: | Its good then, shit. If you, if you on your way shit, it's good. I just uhm, I'm gonna get on top of getting it, uhm, put together for you, shit. |
| CS: | Right! Just…Auh…Just hit me in the morning. You know what I'm saying. Cause I need to get me a driver. You know that. (unintelligible). My license is still on the ramp. |
| JAMES: | Right! Right! |
| CS: | That's my hold up right there. Yea! Yea! Otherwise I be sneaking driving. |
| JAMES: | Oh, so you just going to let it move in the morning. |
| CS: | I'll hit back in today, if I can get a driver today. Before you, you know what I'm saying, put anything together [unintelligible] let me se if I can get a driver put together on that end. I'm ready, you know what I'm saying, I Just need that driver. |
| JAMES: | OK! |
| CS: | So you aren't coming this was. |
| JAMES: | Alright. |
| CS: | So, I'm going to do that. |
| JAMES: | Alright! |
| CS: | Alright! |

11. On February 8, 2005, at approximately 4:55 p.m., the CS again placed a consensually recorded telephone call to James at (773) 317-1074. During the subsequent conversation the CS indicated that he/she had located a driver that would take the CS to meet with James on March 10, 2005.

12. On March 10, 2005, at approximately 10:50 a.m., the CS again placed a consensually recorded call to James at (773) 317-1074. During the subsequent conversation the CS asked James if James was ready for the CS. James asked the CS if he/she was here and the CS indicated that he/she was about an hour out. James then indicated that he was getting it "put together now."

13. Also on March 10, 2005, at 10:55 a.m., the CS again placed a consensually recorded call to James at (773) 317-1074. The CS asked James, "are you going to fry it up?" James responded that, "it's already in motion." The CS asked "is it half and half, 18 and 18?" James responded affirmatively and then stated "hey, that ticket sound like that be, like ten and a half. . .(unintelligible)." The CS responded "Ten and a half. . .(unintelligible)?" James responded "Yeah." The CS then stated "That's cool. I got that."

14. On the same date, at approximately 12:00 p.m., the CS, who is in a passenger seat of a black Grand Prix, being driven by Undercover Officer Terry Brown, arrived at the parking lot of the Plaza Inn Motel (12710 South Ashland,

Calumet Park, Illinois). At approximately 12:20 p.m., the CS gain called James. This call was not recorded, but it was monitored by SA McGuire via a transmitting device previously placed on the CS's person. During the subsequent conversation, the CS was heard to say that he was about five minutes out. At approximately 12:32 p.m., the CS was again heard talking on the phone stating that he was at the Plaza Inn Motel in a Grand Prix.

15. Approximately 12:37 p.m., surveillance units observed a gray Chrysler Pacifica bearing Illinois license plates DALLB1 arrive in the parking lot of the Plaza Inn Motel. The passenger of this vehicle, subsequently identified as Cordell James, was heard, via the transmitter, verbally directing the CS to drive to the Family Dollar store (12610 South Ashland, Calumet Park, Illinois). As the Chrysler Pacifica was observed departing the Plaza Inn Motel parking lot, a red Monte Carlo was also observed departing the lot and driving in tandem with the Pacifica. The Pacifica was being driven by a black male later identified as Tyrone Rush and the Monte Carlo was being driven by a black male later identified as Dwayne Rush. At approximately 12:40 p.m., surveillance units observed the Pacifica and the Monte Carlo arrive at the Family Dollar parking lot. Immediately subsequent to this, the black Grand Prix was observed arriving at the Family Dollar and parking in a space near the Chrysler Pacifica. At this time,

surveillance units observed Cordell James and Tyrone Rush exit the Pacifica and approach the black Grand Prix. Dwayne Rush remained in the Monte Carlo, visibly looking around the parking lot. Surveillance then observed James enter the rear passenger seat of the Grand Prix and Tyrone Rush enter the rear driver seat of the Grand Prix.

16.     A subsequent review of the recorded conversation, obtained from a hidden recording device on the CS's person, indicated that Cordell James provided the CS with the cocaine/crack cocaine and the CS began to weigh it. The CS continued to weigh the cocaine/crack cocaine and was heard telling James and Rush that all of the drugs were not there. Tyrone Rush then told the CS to pay them for the drugs. Rush then took the drugs back and placed them inside the shopping bag that they were taken from, exited the Grand Prix and went back to the Chrysler Pacifica driver's seat. At this same time, James exited the Grand Prix and stood next to the passenger side of the Grand Prix.

17.     At approximately 12:45 p.m., law enforcement officers began to arrive on the scene to execute arrests. As law enforcement arrived, the Monte Carlo was driven away in attempt to flee and James began to flee on foot. James was then observed to pull a pistol from the front area of the his waistband and begin to turn towards officers. As James turned, he was observed looking

directly at a rifle carried by Group Supervisor Roger Vernoy. At this time, James was observed throwing the pistol underneath a semi-trailer that was parked on the lot. Shortly after this, James was taken into custody and SA Frank Sampson located underneath the semi-trailer, a 9 mm Lugar semi-automatic pistol, model 09, Hi-Point firearm, serial number P152628. Upon securing this handgun, SA Sampson located six rounds in the handgun's magazine and one round jammed in the chamber and one round fully in the chamber. At the same time, law enforcement was able to stop the Monte Carlo driven by Dwayne Rush, who was then taken into custody. Concurrent with these events, SA Glenn Haas approached the Pacifica. As SA Haas took Tyrone Rush into custody, Tyrone Rush reached into his jacket and the plastic grocery shopping containing the apparent cocaine/crack cocaine fell out.

18. A subsequent search of this shopping bag revealed 4 plastic baggies containing approximately 492 grams of suspected crack cocaine, and four plastic baggies containing approximately 498 grams of suspected cocaine. SA Chris McGuire subsequently conducted a field test of a sampling of the suspected cocaine and cocaine base and received a positive indication for the presence of cocaine.

19. Also found on James' possession was a cellular telephone, which was assigned telephone number (773) 317-1074.

20. Subsequent to the arrests, SA McGuire debriefed the CS and Officer Brown (undercover agent). The CS indicated that Tyrone Rush was the same individual who had arrived in the Pacifica on numerous deals with James previously. Officer Brown indicated that he observed James in possession of a handgun while James was in the back passenger seat of the Grand Prix and that James provided the CS with the cocaine/crack cocaine in the plastic grocery bag. Officer Brown also indicated that Tyrone Rush took the same plastic grocery bag containing the apparent cocaine/crack cocaine when he exited the vehicle.

21. Subsequently, a verbal Miranda warning was issued by SA McGuire to Tyrone Rush. Tyrone Rush verbally waived his Miranda rights as witnessed by Officer Svilar. Tyrone Rush indicated that he had had communication with James over the past "couple of days." Tyrone Rush indicated that James wanted to obtain the drugs that law enforcement had earlier seized that day. Rush stated that James met Rush and his brother, Dwayne Rush, in Calumet City where they got into the Pacifica and drove to the Plaza Inn Motel.

22. Also at this time, Dwayne Rush was verbally informed of his Miranda rights and verbally waived his rights. Rush indicated that he and his brother, Tyrone Rush, had been in contact with James over the past few days negotiating the drugs that law enforcement had moments before seized. Dwayne Rush indicated that he and his brother, Tyrone, obtained these drugs from an unidentified Hispanic male in Chicago, Illinois, and that they had been dealing with this Mexican male since November or December, 2004, to obtain cocaine for James. Dwayne additionally indicated that when James arrived at their residence, he had a portion of the cocaine already cooked into crack cocaine. Dwayne Rush then stated that James finished cooking some crack cocaine at Dwayne Rush's residence prior to leaving for the Plaza Inn Motel. Dwayne stated that he and his brother always do the deals together when dealing with James and specifically indicated that on today's date, he was to provide look out while Tyrone Rush and James conducted the transaction. Dwayne also indicated that he and his brother, Tyrone, were to receive $500 each in payment for assisting James with the transaction.

23. Subsequently to being advised of his Miranda rights, and after invoking his Miranda rights, James made the following spontaneous statement, "Why should I tell you anything? You already got my two boys."

s/ Christian McGuire
Christian McGuire, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this 11th day of March, 2005.  10:55 AM

s/ Byron G. Cudmore
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE